UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KOLOGIK CAPITAL, LLC,
        Plaintiff and
        Defendant-in-Counterclaim,

        v.                                           CIVIL ACTION NO.
                                                     18-11168-GAO
IN FORCE TECHNOLOGY, LLC,
BRANDON-COPSYNC LLC,
and BRANDON D. FLANAGAN,
        Defendants and
        Plaintiffs-in-Counterclaim.

**REPORT AND RECOMMENDATION RE:**
**CLAIM CONSTRUCTION**

**July 31, 2020**

**BOWLER, U.S.M.J.**

     This case involves a patent dispute over technology that
facilitates communication between police units in an emergency.
Plaintiff Kologik Capital, LLC ("plaintiff") alleges that
defendants In Force Technology, LLC ("In Force"), Brandon-
COPsync LLC, and Brandon D. Flanagan (collectively "defendants")
infringe its patents by distributing defendants' competing In
Force 911 technology.  (Docket Entry # 38, pp. 41-42, ¶¶ 145-
51).  Defendants seek declarations of invalidity, non-
infringement, and unenforceability of plaintiff's patents.
(Docket Entry # 57, pp. 38-40, ¶¶ 41, 50, 58).

     The parties' allegations depend on the construction of
claims in two of plaintiff's patents: U.S. Patent No. 9,047,768
("the '768 Patent") and U.S. Patent No. 9,641,965 ("the '965

Patent") (collectively "patents-in-suit").  The parties dispute
the meaning of the term "predetermined" in the '768 Patent and
the term "direct communication link" in the '965 Patent.  After
conducting a Markman[1] hearing, this court took the matter under
advisement.

PROCEDURAL BACKGROUND

In February 2019, plaintiff filed a 22-count amended
complaint against defendants.  (Docket Entry # 38).  The 22
counts include direct patent infringement by distributing
unlicensed COPsync911 technology (counts XV and XVI), active
inducement of infringement by, inter alia, distributing
unlicensed COPsync911 technology which induces others to
infringe the patents-in-suit (counts XVII and XVIII), direct
infringement by, inter alia, using defendants' In Force 911
technology (counts XIX and XX), and active inducement of
infringement by, inter alia, using defendants' In Force 911
technology which induces others to infringe the patents-in-suit
(counts XXI and XXII).  (Docket Entry # 38, pp. 69-77).
Defendants filed a motion to dismiss the amended complaint on
February 15, 2019 (Docket Entry # 40), but later withdrew the
motion (Docket Entry # 50).  On April 29, 2019, they filed an
answer to the amended complaint and a counterclaim against

---

[1]  Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

plaintiff.  (Docket Entry # 57).  On May 13, 2019, plaintiff filed an answer to the counterclaim.  (Docket Entry # 62).

The district judge referred the case to this court for pretrial case management and reports and recommendations on any dispositive motions.  (Docket Entry # 55).  The parties filed a joint claim construction and prehearing statement proposing that this court construe the two, above-noted claim terms.  (Docket Entry # 73).  As noted, this court held a Markman hearing and took the matter under advisement.  (Docket Entry # 87).

                          FACTUAL BACKGROUND

In or around 2005, COPsync, Inc., plaintiff's predecessor in interest, created COPsync911 Software ("COPsync911"), a "real-time information sharing and data communication network" used to better enable law enforcement to respond to emergencies. (Docket Entry # 38, pp. 8-9, ¶¶ 17-18).  On or about June 2, 2010, COPsync, Inc. entered into a distribution agreement with Brandon Associates, LLC ("Brandon Associates"), in which COPsync, Inc. granted Brandon Associates a non-exclusive license to distribute COPsync911 and related goods and services. (Docket Entry # 38, p. 10, ¶ 23).  Brandon Associates later assigned its rights and responsibilities under the agreement to defendant Brandon-COPsync LLC.  (Docket Entry # 38, p. 11, ¶ 27).  Over the course of its life, the parties amended the

3

distribution agreement "by four separate amendments and a settlement agreement." (Docket Entry # 38, p. 13, ¶ 32).

At some point, the relationship between COPsync, Inc. and defendant Brandon-COPsync LLC soured. The agreement terminated by its own terms on or around June 2017. (Docket Entry # 38, p. 17, ¶ 49). At the time of termination, each party to the agreement believed that the other party owed it a substantial amount of money. (Docket Entry # 38, p. 17, ¶¶ 46, 51). COPsync, Inc. subsequently filed for chapter 11 bankruptcy "in the United States Bankruptcy Court for the Eastern District of Louisiana." (Docket Entry # 38, p. 18, ¶ 54). On November 22, 2017, plaintiff purchased most of COPsync, Inc.'s assets. (Docket Entry # 38, p. 19, ¶ 63). These assets included all of COPsync, Inc.'s "'patents, trademarks and other intellectual property and all accessions, additions, replacements, and substitutions thereto.'" (Docket Entry # 38, pp. 18-19, ¶ 57) (internal citation omitted).

Plaintiff, as the successor in interest to COPsync, Inc., owns a number of patents including the '768 Patent and the '965 Patent. (Docket Entry # 38, pp. 29-30, ¶¶ 98-100, 102-03). Both patents pertain to COPsync911. (Docket Entry # 38, p. 30, ¶¶ 101, 104-05). The '768 Patent describes a system for identifying a subject based on input data from a first patrol unit, determining whether the subject is a likely threat, and

4

identifying and notifying a predetermined number of geographically proximate second patrol units.  ('768 Patent at 1:21-33).[2]  Claim 1 of the '768 Patent includes the following disputed language: "in response to the first and second data, identifying a *predetermined* number of second patrol units that are most geographically proximate to the geographic area, and outputting a second message to the *predetermined* number of second patrol units about the first message."[3]  ('768 Patent at 10:5-9) (emphasis added).  The Brief Summary in the specification reiterates and reinforces this language.  ('768 Patent at 1:29, 1:37).  The specification also provides an example in which the system identifies "a predetermined number" of five second patrol units closest to the first "patrol unit in probable danger."  ('768 Patent at 4:30-34).  The term "predetermined" appears elsewhere in the specification, including in the context of describing what happens when a patrol unit enters "'pursuit mode.'"  ('768 Patent at 6:67, 7:6).  While in pursuit mode, the patrol unit "reports its then-

---

[2]  The '768 Patent appears in multiple docket entry numbers, which, for efficiency, are not repeated.  (Docket Entry ## 27-18, 38-16, 82-1, 82-2).

[3]  This same language also appears in claims 19 and 37, which are the other asserted claims necessitating claim construction in the '768 Patent.  The parties do not draw any distinctions between the constructions they propose to the "predetermined" language in Claim 1 versus claims 19 and 37.

current geographic location to the CSP[4] at a higher rate . . . until either a predetermined amount of time expires or the patrol unit receives an 'end pursuit mode' command." ('768 Patent, at 7:4-7).

The '965 Patent describes a method through which a user, such as a school administrator, can communicate with one or more mobile patrol units. ('965 Patent at 1:28-32).[5] The method also provides "environment information" to the mobile patrol units. ('965 Patent at 1:32-35). As stated in Claim 1, this method involves, in part, "enabling a *direct communication link* between the user operator and an operator associated with a respective one of the one or more second mobile units." ('965 Patent at 15:23-25) (emphasis added). Claim 15 contemplates "[t]he method of claim 1 wherein enabling a direct communication link includes opening a chat room for facilitating direct communications between the user operator and users associated with the one or more second mobile units." ('965 Patent at 16:13-16). The specification provides other examples of potential direct communication links, including "a telephone link," as well as "audio, text, or video." ('965 Patent at 10:29-32). The

---

[4] CSP refers to "a crime-fighting services platform." ('768 Patent at 2:24-25).

[5] The '965 Patent appears in multiple docket entry numbers, which, for efficiency, are not repeated. (Docket Entry ## 30-1, 36-1, 38-17, 82-2).

specification also elucidates the usefulness of the direct
communication link:

> For example, the process **1000** can enable school personnel
> to *instantaneously* communicate with local law enforcement
> patrol vehicles and agencies and summon assistance from the
> nearest law enforcement patrol officers.  School personnel
> can also provide accurate real-time information to the
> closest patrol vehicles as to the nature of the threat or
> criminal activity.

('965 Patent at 8:51-58) (bold text in original and italics
added).

DISCUSSION

I.  <u>Legal Framework</u>

Claim construction is a matter of law for the court to
decide.  <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. at 372.
While the court does not need to construe every term in the
claims, "the court must resolve actual disputes regarding the
proper scope of a claim term."  <u>Summit 6, LLC v. Samsung Elecs.
Co., Ltd.</u>, 803 F.3d 1283, 1291 (Fed. Cir. 2015).  Claim terms
are construed in such a way as to "'ensure that the jury fully
understands the court's claim construction rulings and what the
patentee covered by the claims.'"  <u>Power-One, Inc. v. Artesyn
Techs., Inc.</u>, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (quoting
<u>Sulzer Textil A.G. v. Picanol N.V.</u>, 358 F.3d 1356, 1366 (Fed.
Cir. 2004)).

Proper construction generally requires giving the words of
a claim their "ordinary and customary meaning."  <u>Vitronics Corp.</u>

7

v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).
"[T]he ordinary and customary meaning of a claim term is the
meaning that the term would have to a person of ordinary skill
in the art in question at the time of the invention." Phillips
v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).
The proper sources for determining this meaning "include 'the
words of the claims themselves, the remainder of the
specification, the prosecution history, and extrinsic evidence
concerning relevant scientific principles, the meaning of
technical terms, and the state of the art.'" Id. at 1314
(quoting Innova/Pure Water, Inc. v. Safari Water Filtration
Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  Of these
sources, the claims, the specification, and the prosecution
history are more significant than any extrinsic evidence.
Vitronics, 90 F.3d at 1582.  "In some cases, the ordinary
meaning of claim language as understood by a person of skill in
the art may be readily apparent even to lay judges, and claim
construction in such cases involves little more than the
application of the widely accepted meaning of commonly
understood words." Phillips, 415 F.3d at 1314.

Claim construction analysis begins with the words of the
claims themselves. Brookhill-Wilk 1, LLC v. Intuitive Surgical,
Inc., 334 F.3d 1294, 1298 (Fed. Cir. 2003).  This includes not
only the disputed terms, but also the surrounding words and

phrases that give these terms context.  Id. at 1299.
Furthermore, "the person of ordinary skill in the art is deemed
to read the claim term not only in the context of the particular
claim in which the disputed term appears, but in the context of
the entire patent, including the specification." Phillips, 415
F.3d at 1313.  "Because claim terms are normally used
consistently throughout the patent, the usage of a term in one
claim can often illuminate the meaning of the same term in other
claims." Id.  "There is a heavy presumption that claim terms
are to be given their ordinary and customary meaning." Aventis
Pharm. Inc. v. Amino Chems. Ltd., 715 F.3d 1363, 1373 (Fed. Cir.
2013) (citations omitted).  Claim construction should aim to
give effect to all of the terms in a claim, even if this
ultimately renders the claim invalid.  Haemonetics Corp. v.
Baxter Healthcare Corp., 607 F.3d 776, 781 (Fed. Cir. 2010)
(citations omitted).

    In addition to the words of the claims themselves, "the
specification necessarily informs the proper construction of the
claims." Phillips, 415 F.3d at 1316; see also Vitronics, 90
F.3d at 1582 ("Thus, the specification is always highly relevant
to the claim construction analysis.  Usually, it is dispositive;
it is the single best guide to the meaning of a disputed
term.").  Reviewing the specification is necessary to "determine
whether the inventor has used any terms in a manner inconsistent

with their ordinary meaning," either expressly defining the claim terms or defining them by implication. <u>Vitronics</u>, 90 F.3d at 1582.

The court may not read limitations from the specification, such as from a preferred embodiment, into the claims, "absent the inventor's express intention to the contrary." <u>Nuance Commc'ns, Inc. v. Abbyy Software House, Inc.</u>, Civil Action No. 08-02912 JSW, 2012 WL 1188903, at *2 (N.D. Cal. Apr. 9, 2012) (citing <u>Teleflex, Inc. v. Ficosa N. Am. Corp.</u>, 299 F.3d 1313, 1326 (Fed. Cir. 2002)); <u>see also</u> <u>Phillips</u>, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"); <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc) ("The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims."); <u>cf.</u> <u>Abbott Labs. v. Sandoz, Inc.</u>, 566 F.3d 1282, 1288 (Fed. Cir. 2009) (en banc) (recognizing "'fine line between'" encouraged and prohibited use of specification and stating that court may reach "narrower construction, limited to the embodiment(s)" in specification, when claims, specification, or "prosecution history clearly indicate that the invention encompasses no more than that confined structure or method"). To avoid improperly importing limitations from the specification

into the claims, the court must determine whether an embodiment is merely an example to teach those of skill in the art how to make and use the invention, or "whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." Phillips, 415 F.3d at 1323.[6]

The court may also consult extrinsic evidence to help determine the meaning of claim terms, including "'expert and inventor testimony, dictionaries, and learned treatises.'" Id. at 1317 (quoting Markman, 52 F.3d at 980). This evidence "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." Id. at 1319. Extrinsic evidence, however, is less reliable than the patent and the prosecution history and carries less weight. Id. at 1318. Accordingly, the court should consider any extrinsic evidence "in the context of the intrinsic evidence." Id. at 1319.

II. "Predetermined"

Plaintiff argues that the term "predetermined" does not require construction and should be given its plain and ordinary

---

[6]  After reviewing the claims themselves and the specification, the court "should also consider the patent's prosecution history, if it is in evidence." Markman, 52 F.3d at 980. Here, neither party presents evidence from either patent's prosecution history.

meaning.  (Docket Entry # 82, p. 9).  Alternatively, plaintiff proposes that the court construe "predetermined" as "determined prior to outputting a second message."  (Docket Entry # 82, p. 10).  Defendants contend that the court should construe "predetermined" as "decided prior to receiving the first data." (Docket Entry # 83, p. 5) (internal quotation marks omitted).[7]

The parties agree that "predetermined" means determined prior to some event (Docket Entry # 82, p. 13) (Docket Entry # 83, p. 7), and that, in the context of the asserted claims, the thing that is predetermined is the "number of second patrol units."  (Docket Entry # 81, pp. 10-11) (Docket Entry # 84, p. 5).  The dispute in this case is *when* the number of second patrol units is determined, i.e., in advance of receiving the first data or, more broadly, prior to outputting the second message.  Simply stating that the term "predetermined" carries its "plain and ordinary meaning" does nothing to resolve this dispute.  See Summit 6, 802 F.3d at 1291.  Consequently, the term requires construction.

Claim 1 claims "[a] method performed by an information handling system."  ('768 Patent at 9:61).  The relevant language in the claim is as follows:

---

[7]  The parties agree that the words "determined" and "decided" in their proposed constructions mean the same thing for purposes of the claim construction.  (Docket Entry # 88, p. 26).

>       in response to the first and second data, identifying a
>       predetermined number of second patrol units that are most
>       geographically proximate to the geographic area, and
>       outputting a second message to the predetermined number of
>       second patrol units about the first message.

('768 Patent at 10:5-9). Two events occur in response to the
first and second data: (1) identifying a predetermined number of
second patrol units and (2) outputting a second message to those
units. First and foremost, it stands to reason that the system
must identify the patrol units that will receive the second
message *before* it can output the message to them. See <u>Altiris,
Inc. v. Symantec Corp.</u>, 318 F.3d 1363, 1369-70 (Fed. Cir. 2003)
(method claim steps must be performed in the order in which they
are written if required "as a matter of logic or grammar").
Because the system is "identifying a *pre*determined number of
second patrol units" ('768 Patent at 10:5-6) (emphasis added),
the number of units must be determined prior to the
identification step. See <u>Am. Superconductor Corp. v. S & C
Elec. Co.</u>, Civil Action No. 11-10033-FDS, 2012 WL 5932071, at
*12 (D. Mass. Nov. 26, 2012) ("If an action is to be done for a
'predetermined first duration,' it follows that the duration
must be determined before commencing that action.").

A similar description in the specification illustrates the
point: "if the CSP determines . . . that the subject is a likely
threat, then the CSP executes a software application for
identifying a predetermined number (e.g., 5) of other patrol

units that are most geographically proximate to the patrol unit
in probable danger." ('768 Patent at 4:30-34). Here, as in the
claim, the system is identifying a predetermined number of units
based on proximity to a particular location. The number, in
this case five units, is determined prior to the identification
step. In other words, at this point, the system already knows
that it needs five patrol units, and now it is identifying the
five units that are closest to the original patrol unit in
probable danger.

Defendants argue that, because the system identifies a
predetermined number of patrol units "in response to the first
and second data," the number of patrol units to be identified
must necessarily be determined prior to the first and second
data. (Docket Entry # 83, pp. 5-6). This contention
misconstrues the claim language. What specifically is happening
"in response to the first and second data" is that the system is
identifying a predetermined number of patrol units.
"Predetermined," in this context, means that the system has
already determined how many units it must now identify. While
this means that both the number of units determination and the
first and second data occur prior to the identification, it
offers no insight into whether the determination comes before or
after the first and second data. Both possibilities are
consistent with the claim language. Nothing in the claim

14

requires that the system identify the patrol units immediately
after receiving the first and second data, nor is there any
reason why the system could not determine the desired number of
units after receiving the first and second data but before
identifying the units in the geographic proximity that will
receive the second message.

Insofar as defendants' argument relies on the order of the
steps presented in Claim 1, it overemphasizes the significance
of the order. As a rule, "although a method claim necessarily
recites the steps of the method in a particular order . . . the
claim is not limited to the performance of the steps in the
order recited, unless the claim explicitly or implicitly
requires a specific order." Baldwin Graphic Sys., Inc. v.
Siebert, Inc., 512 F.3d 1338, 1345 (Fed. Cir. 2008). In order
to determine whether the claim requires a specific order, the
court employs a two-part test:

> First, we look to the claim language to determine if, as a
> matter of logic or grammar, [the method steps] must be
> performed in the order written. . . . If not, we next look
> to the rest of the specification to determine whether it
> "directly or implicitly requires such a narrow
> construction."

Altiris, 318 F.3d at 1369-70 (emphasis omitted) (quoting
Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d
1323, 1343 (Fed. Cir. 2001)).

Applying the first prong of the test to Claim 1 reveals a limited ordering requirement. As previously discussed, because the CSP identifies a predetermined number of second patrol units "in response to the first and second data," the identification step necessarily happens after the CSP receives the first and second data. ('768 Patent at 10:5-6). Likewise, the CSP must identify the second patrol units before it can send the second message to those units. Additionally, because the second message is "about the first message," the CSP cannot transmit the second message until after it receives the first message. ('768 Patent at 10:9). However, although the data are characterized as "first" and "second," nothing in the claim language prohibits the second data from being transmitted before or concurrently with the first data. Similarly, while the language itself is clear that the number of second patrol units must be determined prior to the identification step, it is ambiguous as to whether the number is determined before or after the CSP receives the first data and/or the second data.

Turning to the test's second prong, the specification does not show that the method steps must be performed precisely as written in Claim 1. The specification includes three flowcharts showing different operations of the system: FIG. 3, FIG. 4, and FIG. 5. ('768 Patent at 3:63, 5:34-35, 6:20). All three show a different process from what appears in Claim 1. In FIG. 3,

16

which describes a traffic stop, there is no second data because the first patrol unit's location, captured by the first data, is the same as the potential threat's location.  ('768 Patent at Sheet 3).  In FIG. 4, where the user selects a geographic area on an interactive map as in Claim 1 ('768 Patent at 9:65-67), the CSP identifies *all* units in the selected location, as opposed to a predetermined number of units.  ('768 Patent at Sheet 4).  Finally, FIG. 5 ends with the CSP querying person or vehicle information and returning that information to the user, leaving out any mention of first data, second data, second patrol units, or a second message.  ('768 Patent at Sheet 5).  The specification also instructs that "[i]n some alternative implementations, the operations noted in the block [of a block diagram in the Figures] may occur out of the order noted in the Figures."  ('768 Patent at 9:13, 21-22).  In short, neither the language of the claim itself nor the specification justifies limiting the method steps in Claim 1 to the order in which they are written.

Defendants also argue that their proposed construction avoids rendering the term "predetermined" redundant in the claim.  (Docket Entry # 81, p. 12) (Docket Entry # 83, pp. 7-8).  This concern is unfounded, as the term already offers two pieces of information that eliminate its purported redundancy.  First, as discussed, it informs the reader that the number of units to

17

be identified is determined prior to the identification, rather
than concurrently.  If the claim said only that the CSP
identified a number of units, instead of a predetermined number
of units, then it would imply that the CSP determined the number
of units during the identification step.

Second, the term "predetermined" clarifies that the system
identifies a particular number of units closest to the location
specified by the second data.  This is in contrast to the
example process in FIG. 4, in which the CSP identifies "all
other patrol units that are then-currently located within the
officer's specified geographic area."  ('768 Patent at 5:63-65).
Moreover, the claim includes "identifying a predetermined number
of second patrol units that are most geographically proximate to
the geographic area."  ('768 Patent at 10:5-7).  In this
passage, the phrase "that are most geographically proximate to
the geographic area" is a restrictive clause limiting "a
predetermined number of second patrol units."  See Kettle v.
United States, 104 Fed. Cl. 699, 721 (2012) (citing case which,
citing well-known grammar book, identifies the "rule of grammar
that restrictive clause limits or defines what immediately
precedes it and is not set-off by a comma"); Gershenson v. Sec'y
of Health & Human Servs., No. 90-4005V, 1997 WL 79874, at *8 n.6
(Fed. Cl. Feb. 10, 1997) ("It is true that the word 'which'
usually begins a nonrestrictive clause while the word 'that'

18

usually antecedes a restrictive clause."); see also In re Hyatt, 708 F.2d 712, 714 (Fed. Cir. 1983) ("A claim must be read in accordance with the precepts of English grammar.").  The term therefore teaches that the CSP will identify some particular, previously determined number of units that are closest to the relevant location.

If the claim only included "identifying a number of second patrol units" that are most geographically proximate to the geographic area, then it would be unclear that the CSP is identifying a fixed number of units.  (Docket Entry # 81, p. 15).  This phrase could mean that the CSP identifies a fixed number of units, or it could mean that the CSP identifies whatever units happen to be within a certain proximity to the location at the time, whether that means two units or 20. Specifying that the number of units is "predetermined" resolves this ambiguity, making it clear that the CSP identifies a fixed number of units that does not depend on the units' locations. Because "predetermined" indicates that the number of second patrol units is determined before the identification step and that a preset number of units is being identified, the term has effect within the claim even without construing it as requiring determination prior to the first and second data.  See Haemonetics, 607 F.3d at 781.

"Predetermined" appears in one other context in the
specification.  In this instance, in response to a "'pursuit
mode' command," a patrol unit automatically reports its location
to the CSP at a higher rate until a "predetermined amount of
time" expires.  ('768 Patent at 6:67-7:6).  Defendants point out
that the usage of "predetermined" here is identical to its usage
in the asserted claims, in that both indicate that the system
has determined what it will do prior to the event in question.
(Docket Entry # 83, pp. 8-9).  While it is true that the term
carries the same meaning in both instances, it does not carry
the same *timing*.  In the "pursuit mode" case, there are only two
events: a user gives the "pursuit mode" command, and then the
system automatically reports the unit's location more frequently
until a predetermined amount of time elapses.  The word
"automatically" implies that the frequent update response
happens immediately after the "pursuit mode" command ('768
Patent at 7:2), and so the only opportunity for the system to
determine the amount of time in question before its use is
before the user issues the command.  Conversely, Claim 1
includes four events: receiving the first data; receiving the
second data and a first message; "identifying a predetermined
number of second patrol units"; "and outputing a second message
to the" identified second patrol units.  ('768 Patent at 9:63-
10:9).  The claim contains no restriction on how much time may

20

pass between events.  Ultimately, the two processes are different, and the timing implied in one cannot be imposed onto the other.

Defendants also contend that the specification teaches that the invention is meant to increase efficiency generally. (Docket Entry # 88, p. 35).  Insofar as defendants argue that increasing efficiency requires that each method step happen immediately after the previous step, such an argument impermissibly seeks to read a general limitation from the specification into the claims "wholly apart from any need to interpret . . . particular words or phrases in the claim."  In re Paulsen, 30 F.3d 1475, 1480 (Fed. Cir. 1994); see also Teleflex, 299 F.3d at 1326; Markman, 52 F.3d at 980.

Claim 1, as well as claims 19 and 37, claim a method that determines the number of second patrol units that will receive the second message prior to identifying the particular units, but not necessarily prior to the first and second data. Accordingly, and for the previously identified reasons, the court construes "predetermined" as: determined prior to identifying the second patrol units that are most geographically proximate to the geographic area.

III.  "Direct Communication Link"

As with "predetermined," plaintiff asserts that "direct communication link" does not require construction because it "is

already plain and understandable." (Docket Entry # 82, p. 13)
(Docket Entry # 84, p. 6). In the alternative, plaintiff's
proposed construction is "a channel allowing the user operator
to communicate with a respective one of the one or more second
mobile units." (Docket Entry # 82, pp. 13-14). Defendants'
proposed construction is "[a] channel allowing instantaneous
communication between a user operator and one or more second
units." (Docket Entry # 81, p. 13).

The dispute between the parties is whether or not a "direct
communication link" in claims 1 and 15 requires instantaneous
communication. Defendants argue that the repeated use of
"instantaneous" and "real-time" in the specification teaches
that the invention requires instantaneous communication.
(Docket Entry # 83, pp. 10-11) (Docket Entry # 81, pp. 14-16).
Plaintiff counters that defendants are attempting to confine the
claims based on a single embodiment in the specification.
(Docket Entry # 84, pp. 5-6) (Docket Entry # 82, p. 14).

Defendants cite to seven passages in the specification
supporting their contention that a direct communication link
must enable instantaneous communication. (Docket Entry # 83,
pp. 10, 13) (Docket Entry # 81, pp. 14-16).[8] Of these, four are

---

[8] This court counts defendants' separate citations of the '965
Patent at 8:51-55 and at 8:55-58 as a single passage. (Docket
Entry # 81, p. 16).

wholly unrelated to any "direct communication link."  More
specifically, three of the four involve the CSP making records
available for agency query "[o]n a substantially real-time
basis" ('965 Patent at 7:53-62, 8:12-24, 8:39-45), while the
fourth mentions the possibility of obtaining "real-time GPS
coordinates" from the first unit ('965 Patent at 12:18-24).  The
remaining three passages describe embodiments of a direct
communication link.  The first provides an example, introduced
as such, which reads:

> For example, the process **1000** can enable school personnel
> to instantaneously communicate with local law enforcement
> patrol vehicles and agencies and summon assistance from the
> nearest law enforcement patrol officers.  School personnel
> can also provide accurate real-time information to the
> closest patrol vehicles as to the nature of the threat or
> criminal activity.

('965 Patent at 8:51-58) (emphasis in original).[9]  The other two
indicate possible forms that a "direct communication link" may
take, including a chat room, a telephone link, an audio feed,
text, or video.  ('965 Patent at 10:22-32, 12:35-39).

Ordinarily, a court may not read limitations from
embodiments in the specification into the claims unless the
inventor expressly intended to so limit the claims.  Phillips,
415 F.3d at 1323; Teleflex, 299 F.3d at 1326.  However, when an
inventor "'repeatedly and uniformly describes'" its invention in

---

[9]  See the previous footnote.

a particular way in the specification, it is proper to limit the invention to that description. ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1374-75 (Fed. Cir. 2009); see also Honeywell Int'l, Inc. v. ITT Indus., Inc., 452 F.3d 1312, 1318 (limiting claimed invention to particular fuel filter where specification repeatedly referred to filter as "the present invention" or "[t]his invention").

The Federal Circuit in ICU Med. upheld the district court's construction of "spike" as "'an elongated structure having a pointed tip for piercing the seal, which tip may be sharp or slightly rounded.'" ICU Med., 558 F.3d at 1374. Although the claims did not expressly require the spike to be pointed or able to pierce the seal, the specification consistently described the spike in this manner. Id. at 1374-75 (noting that "(1) each figure depicts the spike as elongated and pointed; (2) in each figure depicting an activated valve, the spike pierces the seal; and (3) the patents neither describe piercing as optional nor describe any non-piercing item as a spike."). The court held that "it is 'entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language.'" Id. at 1375 (quoting Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005)). Recognizing the potential danger of importing limitations from the specification into the claims, the court focused on

"'understanding how a person of ordinary skill in the art would understand the claim terms . . . after reading the entire patent.'"  Id. (quoting Phillips, 415 F.3d at 1323, 1321).  The Federal Circuit later clarified that ICU Med. does not support limiting claims to a single embodiment in the specification simply due to the absence of other embodiments.  Jang v. Bos. Sci. Corp., 493 F. App'x 70, 78 (Fed. Cir. 2012) (unpublished) (citing ICU Med., 558 F.3d at 1375); see also Phillips, 415 F.3d at 1323; Teleflex, 299 F.3d at 1324.

Defendants' proposed "instantaneous" limitation on the claim term is not used "'repeatedly and uniformly,'" ICU Med., 558 F.3d at 1374, in the specification.  The word "instantaneously" appears exactly once, as an example of a process for communication between school personnel and law enforcement.  ('965 Patent at 8:51-55).  The same example in the specification states that the process also allows school personnel to "provide accurate real-time information to the closest patrol vehicles."  ('965 Patent at 8:55-58).  The phrase "real-time" appears in one other relevant passage, indicating that a direct communication link can be, "[f]or example, a chat session, audio feed, or other form of live, real-time communication."[10]  ('965 Patent at 12:35-39).  A person of

---

[10]  This passage appears as part of an example process for outputting a communication associated with an alert subsequent

ordinary skill in the art would not understand that a "direct communication link" requires instantaneous or real-time communication based on two examples.  See Phillips, 415 F.3d at 1323.  Moreover, even assuming that the specification does not provide any examples of a direct communication link that would not enable instantaneous communication, this is not enough to impose an "instantaneous" limitation on the claims.  See id.; Teleflex, 299 F.3d at 1324.

Defendants also argue that the patent, read as a whole, "teaches speed of communications as a focus of the patent." (Docket Entry # 83, p. 14); see Phillips, 415 F.3d at 1313 (person of ordinary skill in the art reads claim term not only in context of particular claim but also in "context of the entire patent, including the specification").  Defendants cite to several passages in the specification to support this contention, including the aforementioned direct communication link embodiments.  (Docket Entry # 83, p. 14).  These passages will not bear the weight defendants attribute to them.  Three of the cited passages describe the process by which the CSP automatically stores certain records, including background check

---

to a background check.  The example process implies that, in these situations, a direct communication link is not always necessary: "*In some implementations*, a direct communication link can be enabled between the user operator and an operator associated with a respective one of one or more second units." ('965 Patent at 12:35-37) (emphasis added).

queries and "pursuit" records.  ('965 Patent at 7:53-62, 8:12-
24, 8:40-45).  The CSP then makes these records available for
agency query "[o]n a substantially real-time basis after such
receipt and storage . . . and subsequently."  ('965 Patent at
7:53-62, 8:12-24, 8:40-45).  Besides being unrelated to any
direct communication link, these passages do not teach that
real-time access to information is essential or part of the
invention as claimed.  As noted, the CSP makes the records
available for agency query immediately upon receipt *and*
*subsequently*.  While the agency may query the information in
real-time, it may also query the information at any later time.
Merely providing for the possibility of real-time information
access does not teach that such access is essential or part of
the invention as claimed.

The remaining cited passage concerns location data for the
first unit.  The process can determine the first unit's
location, "for example, by looking up an address associated with
the first unit, by obtaining real-time GPS coordinates (e.g., if
the first unit is mobile), [or] by entry of a location by a
user."  ('965 Patent at 12:21-24).  Here, again, real-time
information is only one of multiple options, none of which is
directly related to a direct communication link.  If the patent
relied on speed of communications to such an extent as to
require real-time communication, then a person of ordinary skill

in the art would also expect it to require real-time location information rather than illustrate the matter as an example.

Notwithstanding the example process, defendants contend that the claims themselves teach that the invention requires the user operator to provide real-time location information, which in turn implies the need for instantaneous communication. (Docket Entry # 81, p. 14). Defendants' argument mischaracterizes the claims. In the first instance, defendants argue that, without "instantaneous communication between the user operator and the operator associated with the mobile unit . . ., the information relayed from the user operator would become obsolete in an emergency." (Docket Entry # 81, p. 14). The claims, however, do not limit the invention to emergencies. The word "emergency" only appears in Claim 14, covering "[t]he method of claim 1 wherein the one or more second mobile units are associated with emergency service units." ('965 Patent at 16:9-11). The existence of a dependent claim specifying that the second mobile units can be emergency service units implies that the second mobile units are not always emergency service units, meaning that not every situation contemplated by the independent claim is an emergency. See Phillips, 415 F.3d at 1315 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that that the limitation in question is not present in the independent claim").

Additionally, the claims do not require that the user operator provide location information in real-time, or that such information, once provided, must be subsequently updated.  ('965 Patent at 15:26-35, 15:42-43, 15:65-67); cf. ('965 Patent at 5:28-31) ("[T]he patrol units report their respective then-current geographic locations to the CSP at a periodic rate (e.g., once every 15 seconds), so that such reports are periodically updated.").

While instantaneous communication confers certain obvious benefits in an emergency, the '965 Patent does not teach that it is a requirement of the invention broadly or the direct communications link specifically.  This resolves the primary difference between the parties' proposed constructions.  Both plaintiff and defendants agree that a direct communication link is a channel allowing communication between the user operator and the second mobile units.  (Docket Entry # 81, p. 13) (Docket Entry # 82, p. 13).  The only remaining dispute is whether a direct communication link allows communication "between a user operator and *one or more* second units" (Docket Entry # 81, p. 13) (emphasis added), or between a user operator and "a respective *one* of the one or more second mobile units."  (Docket Entry # 82, p. 13) (emphasis added).  Defendants propose the former language whereas plaintiff proposes the latter language.  Because at least one of the claims contemplates creating a

29

direct communication link between the user operator and a user associated with multiple second mobile units, the proper construction should include defendants' proposed "one or more" language. ('965 Patent at 16:13-16).  Accordingly, the court construes "direct communication link" as "a direct channel allowing communication between a user operator and one or more second mobile units."

CONCLUSION

For the foregoing reasons, the court **RECOMMENDS**[11] that "predetermined" be construed as "determined prior to identifying the second patrol units that are most geographically proximate to the geographic area" and "direct communication link" be construed as "a direct channel allowing communication between a user operator and one or more second mobile units."

                                    __/s/ Marianne B. Bowler_____
                                    **MARIANNE B. BOWLER**
                                    United States Magistrate Judge

---

[11]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made, and the basis for such objection should be included.  See Fed. R. Civ. P. 72(b).  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.