UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KOLOGIK CAPITAL, LLC,
     Plaintiff and
     Defendant-in-Counterclaim,


     v.                                        CIVIL ACTION NO.
                                               18-11168-GAO

IN FORCE TECHNOLOGY, LLC,
BRANDON-COPSYNC LLC,
and BRANDON D. FLANAGAN,
     Defendants and
     Plaintiffs-in-Counterclaim.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS THAT THE**
**ASSERTED CLAIMS OF U.S. PATENT NOS. 9,047,768 AND 9,641,965 ARE**
**INVALID UNDER 35 U.S.C. § 101 (DOCKET ENTRY # 191)**

**January 13, 2022**

**BOWLER, U.S.M.J.**

Pending before this court is a Fed. R. Civ. P. 12(c) ("Rule 12(c)") motion for judgment on the pleadings filed by defendants In Force Technology, LLC, Brandon-CopSync LLC, and Brandon D. Flanagan (collectively, "defendants"). (Docket Entry # 191). Plaintiff Kologik Capital, LLC ("plaintiff") opposes the motion. (Docket Entry # 196).

PROCEDURAL BACKGROUND

Plaintiff initiated this action on June 5, 2018. (Docket Entry # 1). The amended complaint alleges, inter alia, direct patent infringement (counts XV, XVI, XIX, and XX) and active inducement of patent infringement (counts XVII, XVIII, XXI, and

XXII) (the "complaint").  (Docket Entry # 38, pp. 69-77).  The
two patents at issue are U.S. Patent Nos. 9,047,768 ("the '768
Patent") and 9,641,965 ("the '965 Patent") (collectively, the
"Asserted Patents").  (Docket Entry ## 38-16, 38-17).  On April
17, 2019, District Judge George A. O'Toole, Jr. referred the
case to this court for pretrial case management and the issuance
of reports and recommendations on any dispositive motions.
(Docket Entry # 55).

On December 6, 2019, this court granted plaintiff's
unopposed motion for leave to amend its infringement
contentions.  (Docket Entry ## 86, 87).  Plaintiff asserts
infringement of claims 1-3, 19-21, and 37-39 of the '768 Patent
and claims 1, 8, 11, 12, and 15-18 of the '965 Patent
(collectively, the "Asserted Claims").  (Docket Entry # 192, p.
5) (Docket Entry # 196, p. 8).  On December 9, 2019, this court
held a Markman[1] hearing on the parties' disputed claim terms.
(Docket Entry # 87).  This court subsequently issued a Report
and Recommendation construing the disputed claim terms, which
Judge O'Toole adopted on July 14, 2021.  (Docket Entry ## 117,
172).

---

[1]   Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

FACTUAL BACKGROUND[2]

I.   The Parties and COPsync911 Software

In or around 2005, plaintiff's predecessor in interest, COPsync, Inc. ("COPsync"), created COPsync911 Software ("COPsync911").  (Docket Entry # 38 p. 8-9, ¶¶ 16-17).  After COPsync filed for bankruptcy in September 2017, plaintiff purchased all of COPsync's patents, including the Asserted Patents. (Docket Entry # 38, pp. 18-19, ¶¶ 54, 57, 63).  The Asserted Patents both pertain to COPsync.  (Docket Entry # 38, p. 30, ¶ 105).

"When introduced, [] COPsync911 [] provided law enforcement the first and only in-car real-time information sharing and data communication network with threat alert service for schools and other potentially at-risk facilities."  (Docket Entry # 38 p. 9, ¶ 17).  COPsync911 operates as follows:

> When activated by a customer's staff located in a customer's building, [] COPsync911 . . . send[s] a real-time threat alert, immediately connecting the staff member of a building to the five closest officers to that location.  A text alert is sent to these officers and two real-time chat windows are created, one between the staff member and the dispatcher and the other between the staff member and the law enforcement officer nearby. Through the system, the officer is provided a map of the building, and both the officer and the dispatcher can

───────────

[2]  For brevity, the Factual Background provides a summary of the facts relevant to plaintiff's patent infringement claims and does not seek to summarize those facts in the complaint that pertain to plaintiff's other claims or that are otherwise irrelevant for the purposes of defendants' Rule 12(c) motion to dismiss (Docket Entry # 191).

receiver further information from the staff member.
Real time chat with a dispatcher allows the staff member
to provide further information to responding officers.

(Docket Entry # 38, p. 9, ¶ 17).

On or about June 2, 2010, COPsync entered into a
distribution agreement with Brandon Associates, LLC ("Brandon
Associates"), granting Brandon Associates a non-exclusive
license to distribute COPsync911 (the "agreement"). (Docket
Entry # 38, p. 10, ¶ 23).[3] "[A]fter the termination of the []
[a]greement, as amended," defendants continued to sell, license,
or otherwise distribute COPsync911 and collect licensing fees
"from customers/end-users of" COPysync911. (Docket Entry # 38,
pp. 26-27, ¶¶ 86-88). In a "February 26, 2018 letter to
[plaintiff's] customers, [d]efendants [] revealed the
development of a new, competing software package called 'In
Force 911,'" which "had been in development 'over the [prior]
eight months'" and "as early as June of 2017." (Docket Entry #
38, p. 24, ¶¶ 80, 82) (citation omitted).

II.   <u>The Asserted Patents and Asserted Claims</u>

The United States Patent and Trademark Office (the "USPTO")
issued the '768 Patent on June 2, 2015 and the '965 Patent on

---

[3] Brandon Associates later assigned its rights and
responsibilities under the agreement to defendant Brandon-
COPsync LLC. (Docket Entry # 38, p. 11, ¶ 27). The parties
have amended the agreement "by four separate amendments and a
settlement agreement." (Docket Entry # 38, p. 13, ¶ 32).

May 2, 2017.  (Docket Entry # 38, p. 30, ¶¶ 99, 102) (Docket Entry ## 38-6, 38-7).  Both of the Asserted Patents are entitled "Method, System and Computer Program Product For Law Enforcement."  (Docket Entry # 38, p. 30, ¶¶ 99, 102) (Docket Entry ## 38-6, 38-7).  The '768 Patent describes a system for identifying a subject based on input data from a first patrol unit, determining whether the subject is a likely threat, and identifying and notifying a predetermined number of geographically proximate second patrol units.  ('768 Patent at 1:21-33).[4]  The '965 Patent describes a method through which a user, such as a school administrator, can communicate with one or more mobile patrol units.  ('965 Patent at 1:28-32).  The method also provides "environment information" to the mobile patrol units.  ('965 Patent at 1:32-35).  The Asserted Claims are reproduced as follows.

Claim 1 of the '768 Patent recites:

A method performed by an information handling system, the method comprising:

from a first patrol unit, receiving first data for identifying a location of the first patrol unit;

from the first patrol unit, receiving second data identifying a geographic area on an interactive map presented to an officer associated with the first patrol

---

[4]  The '768 Patent appears in multiple docket entries, including the complaint.  <u>See</u> (Docket Entry ## 27-18, 38-16, 82-1, 82-2).  The '965 Patent does as well.  <u>See</u> (Docket Entry ## 30-1, 36-1, 38-17, 82-2).  This court refers to the Asserted Patents themselves rather than particular docket entries.

unit and a first message from the officer related to the
geographic area wherein the geographic area is proximate
or unrelated to the location of the first patrol unit
but does not include the location; and

in response to the first and second data, identifying a
predetermined number of second patrol units that are
most geographically proximate to the geographic area,
and outputting a second message to the predetermined
number of second patrol units about the first message.

('768 Patent at 9:61-10:9).   Dependent claims 2 and 3 add to

claim 1, respectively: "the second data are specified by a human

officer that is associated with the first patrol unit" ('768

Patent at 10:10-12); and "receiving the first data, receiving

the second data, and outputting the second message occur via a

wireless telecommunications network" ('768 Patent at 10:13-15).

Independent claim 19 of the '768 Patent recites:

An information handling system, comprising:

a network connection for communicating information about
at least one subject, wherein the subject includes at
least one of: a subject vehicle; or a subject person;
and

a computer coupled to the network connection for: from
a first patrol via the network connection, receiving
first data for identifying a location of the first patrol
unit; from the first patrol unit via the network
connection, receiving second data identifying a
geographic area on an interactive map presented to an
officer associated with the first patrol unit and a first
message from the officer related to the geographic area
wherein the geographic area is proximate or unrelated to
the location of the first patrol unit but does not
include the location; and, in response to the first and
second data, identifying a predetermined number of
second patrol units that are most geographically
proximate to the geographic area, and outputting a
second message via the network connection to the

predetermined number of second patrol units about the
first message.

('768 Patent at 11:23-42).  Dependent claims 20 and 21 add to

claim 19, respectively: "the second data are specified by a

human officer that is associated with the first patrol unit"

('768 Patent at 11:43-45); and "the network connection is for

communicating the information via a wireless telecommunications

network" ('768 Patent at 11:46-48).

Independent claim 37 of the '768 Patent recites:

A computer program product, comprising:

a non transitory computer readable storage medium having
computer readable program code embodied therewith,
the computer readable program code comprising:

computer readable program code configured to: from a
first patrol unit, receive first data for identifying a
location of the first patrol unit; from the first patrol
unit, receive second data identifying a geographic area
on an interactive map presented to an officer associated
with the first patrol unit and a first message from the
officer related to the geographic area wherein the
geographic area is proximate or unrelated to the
location of the first patrol unit but does not include
the location: and, in response to the first and second
data, identify a predetermined number of second patrol
units that are most geographically proximate to the
geographic area, and output a second message to the
predetermined number of second patrol units about the
first message;

wherein the subject includes at least one of: a subject
vehicle; or a subject person.

('768 Patent at 12:56-13:8).  Dependent claims 38 and 39 add to

claim 37, respectively: "the second data are specified by a

human officer that is associated with the first patrol unit"

('768 Patent at 13:10-11); and "the computer readable program code is configured to receive the first data, receive the second data, and output the second message via a wireless telecommunications network" ('768 Patent at 13:13-15).

Finally, with respect to the '965 Patent, claim 1 recites:

A method comprising:

receiving a prompt from a user operator using a first unit; determining a location of the first unit, wherein the first unit is at a facility at the location, wherein the facility includes plural different areas each defining a different portion of the facility, and wherein the location is an address of the facility or GPS coordinates of the first unit;

responsive to the prompt, identifying one or more second mobile units within a geographic area associated with the location;

outputting a communication to the one or more second mobile units;

enabling a direct communication link between the user operator and an operator associated with a respective one of the one or more second mobile units;

receiving information specifying a location of interest from the user operator with the prompt or after receiving the prompt, wherein the location of interest is a specific one of the plural different areas of the facility and is not an area in which the user operator or the first unit is present at the time the user operator provides the information specifying the location of interest, and wherein the user operator specifies the location of interest with respect to a visual layout of the facility at the location; and

providing environment information to the one or more second mobile units based at least in part on the prompt wherein the environment information includes a visual representation of the layout of the facility at the

location including a visual representation of the user
specified location of interest.

The dependent Asserted Claims of the '965 Patent add to claim 1
as follows: "the environment information includes a layout of
the facility" (claim 8) ('965 Patent at 15:59-60); "determining
the location includes accessing a record that includes
information representing the location" (claim 11) ('965 Patent
at 16:1-3); "determining the location includes receiving
information specifying the location along with the prompt"
(claim 12) ('965 Patent at 16:4-6); "enabling a direct
communication link includes opening a chat room for facilitating
direct communications between the user operator and users
associated with the one or more second mobile units" (claim 15)
('965 Patent at 16:12-15); "the first unit is a mobile device"
(claim 16) ('965 Patent at 16:16-17); "the first unit is a
mobile telephone, tablet or laptop computer" (claim 17) ('965
Patent at 16:18-19); and "further comprising providing an
application on a mobile device for enabling the user operator to
initiate the prompt" (claim 18) ('965 Patent at 16:20-22).

## STANDARD OF REVIEW

The applicable standard of review for a Rule 12(c) motion
is that of the regional circuit court (here, the First Circuit).
See CardioNet, LLC v. InfoBionic, Inc., No. 2020-2123, 2021 WL
5024388, at *3 (Fed. Cir. Oct. 29, 2021) ("We review . . .

judgment on the pleadings under [Rule] 12(c) according to the law of the regional circuit.").[5]  In the First Circuit, a Rule 12(c) motion for judgment on the pleadings "'is treated much like a Rule 12(b)(6) motion to dismiss.'"  Villeneuve v. Avon Prod., Inc., 913 F.3d 50, 43 n.2 (1st Cir. Mar. 19, 2019) (citation omitted).  A Rule 12(c) motion nonetheless differs from a Rule 12(b)(6) motion because "it implicates the pleadings as a whole."  Aponte-Torres v. University of Puerto Rico, 445 F.3d 50, 54–55 (1st Cir. 2006).  "[T]he well-pleaded facts and the reasonable inferences therefrom" in the complaint are viewed "in the light most favorable to the nonmovant (here, [] plaintiff)."  Kando v. R. I. State Bd. of Elections, 880 F.3d 53, 58 (1st Cir. 2018).  "[A] 'court may not grant a defendant's Rule 12(c) motion unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Curran v. Cousins, 509 F.3d 36, 43 (1st Cir. 2007) (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)).

---

[5]  "Although pleading standards 'are a matter of regional circuit law,' '[r]eview of the substantive patent law embodied in the pleadings' is governed by the law of the Federal Circuit." Esoterix Genetic Lab'ys LLC v. Qiagen Inc., No. 14-CV-13228-ADB, 2016 WL 4555613, at *6 (D. Mass. Aug. 31, 2016) (quoting Bayer Schering Pharma AG v. Lupin, Ltd., 676 F.3d 1316, 1327 (Fed. Cir. 2012)).

Defendants' Rule 12(c) motion seeks to dismiss the complaint's patent infringement claims (counts XV, XVI, XVII, XVIII, XIX, XX, XXI, and XXII).  (Docket Entry # 191).  As further detailed below, defendants' basis for dismissal is that the Asserted Claims are invalid under United State Code, chapter 35, section 101 ("section 101"), "for claiming patent ineligible abstract ideas."  (Docket Entry # 191).

"While the ultimate determination of eligibility under [section] 101 is a question of law, . . . there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination."  Aatrix Software, Inc. v. Green Shades Software, Inc., 882 F.3d 1121, 1128 (Fed. Cir. 2018).  One such fact question is whether a patent "claim element or combination of elements" is "inventive" or, alternatively, "well-understood, routine and conventional to a skilled artisan in the relevant field."  Berkheimer v. HP Inc., 881 F.3d 1360, 1368 (Fed. Cir. 2018).  "Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence."  Id. (citing Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 95 (2011)).  Nevertheless, a court may determine patent eligibility at the Rule 12(c) stage "when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law."  Aatrix Software, 882 F.3d at 1125.  To determine a patent's

eligibility, a court may look to allegations in "sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice."  Id. at 1128.

Thus, "'plausible factual allegations may preclude dismissing a case under [section] 101 where, for example, 'nothing on th[e] record . . . refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6) [or Rule 12(c)].'"  Id. (quoting FairWarning IP, LLC v. Iatric Sys., Inc., 839 F.3d 1089, 1097 (Fed. Cir. 2016)).  "[P]lausible and specific factual allegations that aspects of the claims are inventive are sufficient" to defeat a motion to dismiss. Cellspin Soft, Inc. v. Fitbit, Inc., 927 F.3d 1306, 1317 (Fed. Cir. 2019), cert. denied 140 S. Ct. 907 (2020).

## DISCUSSION

Defendants seek dismissal of the patent infringement counts[6] on the basis that the Asserted Claims are invalid under section 101 "for claiming patent ineligible abstract ideas."  (Docket Entry # 191).  Plaintiff denies that the Asserted Patents concern "'abstract' ideas" and argues that, "even if the Asserted Patents were directed to abstract ideas," they "have additional elements that add 'significantly more' to any such

---

[6] Counts XV, XVI, XVII, XVIII, XIX, XX, XXI, and XXII.

alleged abstract ideas." (Docket Entry # 196, p. 6). Plaintiff also argues that, even if this court concludes "that the Asserted Patents are directed to abstract ideas, factual disputes preclude judgment on the pleadings." (Docket Entry # 196, p. 6).

"Section 101 . . . defines the subject matter eligible for patent protection." Alice Corp. Pty. v. CLS Bank Int'l, 573 U.S. 208, 216 (2014). Under section 101, a patent may be issued to "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof . . . ." 35 U.S.C. § 101. There are "three specific exceptions to [section] 101's broad patent-eligibility principles: 'laws of nature, physical phenomena, and abstract ideas.'" Bilski v. Kappos, 561 U.S. 593, 601, (2010) (citation omitted). "The abstract idea exception prevents patenting a result where 'it matters not by what process or machinery the result is accomplished.'" McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299, 1312 (Fed. Cir. 2016) (citation omitted). However, because "at some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas[,]' . . . an invention is not rendered ineligible for patent simply because it involves an abstract concept." Alice, 573 U.S. at 216

(quoting <u>Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.</u>, 566 U.S. 66, 71 (2012)).

Courts apply a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." <u>Alice</u>, 573 U.S. at 217.  The first step is "determin[ing] whether the claims at issue are directed to one of those patent-ineligible concepts." <u>Id.</u> "While '[t]he [section] 101 inquiry must focus on the language of the Asserted Claims themselves,' the [patent] specification may nonetheless be useful in illuminating whether the claims are 'directed to' the identified abstract idea." <u>ChargePoint, Inc. v. SemaConnect, Inc.</u>, 920 F.3d 759, 767 (Fed. Cir. 2019), <u>cert. denied</u>, 140 S. Ct. 983 (2020) (citation omitted) (quoting <u>Synopsys, Inc. v. Mentor Graphics Corp.</u>, 839 F.3d 1138, 1149 (Fed. Cir. 2016)). [7]  For instance, a court may "look[] to the specification to understand 'the problem facing the inventor' and, ultimately, what the patent describes as the invention."

---

[7]  A patent specification includes, inter alia: a detailed "written description of the invention" (37 C.F.R. § 1.71(a)); the "title of the invention" and "[a] brief abstract of the technical disclosure" (37 C.F.R. § 1.72); "[a] brief summary of the invention indicating its nature and substance" (37 C.F.R. § 1.73); references to, and "a brief description of[,] the several views of [any] drawings" (37 C.F.R. § 1.74); and at least one "claim particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention or discovery" (37 C.F.R. § 1.75(a)).

ChargePoint, 920 F.3d at 767 (quoting In re TLI Commc'ns LLC
Pat. Litig., 823 F.3d 607, 612 (Fed. Cir. 2016)).

If the claims are not directed to a patent-ineligible
concept, "the claims satisfy [section] 101" and the analysis
ends there.  Core Wireless Licensing S.A.R.L. v. LG Elecs.,
Inc., 880 F.3d 1356, 1361 (Fed. Cir. 2018).  If, however, the
claims are directed to a patent-ineligible concept, the next
step is to "ask '[w]hat else is there in the claims.'"  Alice,
573 U.S. at 217 (quoting Mayo, 566 U.S. at 78).  This question
requires consideration of "the elements of each claim both
individually and 'as an ordered combination' to determine
whether the additional elements 'transform the nature of the
claim' into a patent-eligible application."  Id. at 217 (quoting
Mayo, 566 U.S. at 78-79).  In other words, this second step
"[i]s a search for an '"inventive concept"'–i.e., an element or
combination of elements that is 'sufficient to ensure that the
patent in practice amounts to significantly more than a patent
upon the [ineligible concept] itself.'"  Id. at 217-18 (brackets
omitted) (quoting Mayo, 566 U.S. at 72-73).  The "inventive
concept . . . cannot simply be an instruction to implement or
apply the abstract idea on a computer."  Bascom Glob. Internet
Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1349 (Fed.
Cir. 2016).  However, "an inventive concept can be found in the

non-conventional and non-generic arrangement of known,

conventional pieces." Id.

I.   Step One of the Section 101 Inquiry:
     Whether the Asserted Claims Are Directed to an Abstract Idea

     A.   Claim 1 of the '768 Patent
          Is Directed to an Abstract Idea

Defendants argue that claim 1 of the '768 Patent "(and the

rest) is directed to the abstract idea of 'aggregating,

managing, and communicating various information . . . in support

of law enforcement activities . . . ." (Docket Entry # 192, p.

13) (quoting '768 Patent at 2:54-57). Defendants summarize

claim 1 as "a method with steps performed by a generic

'information handling system' comprising":

> (1a) 'receiving first data for identifying a location of
> the first patrol unit'; (1b) 'receiving second data
> identifying a geographic area on an interactive map';
> (1c) receiving 'a first message from the officer related
> to the geographic area'; (1d) 'identifying a
> predetermined number of second patrol units that are
> most geographically proximate to the geographic
> location'; and (1e) 'outputting a second message . . .
> about the first message[.]'

(Docket Entry # 192, p. 12). This claim, defendants argue,

"merely uses generic processes and machinery to claim intended

results." (Docket Entry # 192, p. 13). As examples of the

"generic processes and machinery," defendants note the

following: the tasks "are performed by an 'information handling

system' that . . . communicates via a standard 'TCP/IP' network

such as the 'Internet or an intranet'" (Docket Entry # 192, p.

13) (quoting '768 Patent at 9:61, 2:22-24); the "patrol units" lack any novelty or specialization, as evidenced by how claim 1 recites that "'[e]ach of the [crime-fighting services platform ("CSP")], agencies and patrol units includes a respective computing system [for] processing and communicating information . . . in association with a respective human user'" (Docket Entry # 192, p. 13) (quoting '768 Patent at 2:67-3:6); and "[t]he 'computing system' is . . . an off-the-shelf 'general purpose[] computational resource such as a laptop computer'" (Docket Entry # 192, p. 13) (quoting '768 Patent at 2:67-3:23).

Plaintiff alleges that defendants "omit the context" of "the '768 Patent's specification" because "[i]n reality the specification states: "[t]he CSP . . . *is helpful for accurately and efficiently* aggregating, managing, and communicating various information from and to the agencies and patrol units in support of their law enforcement activities . . . ." (Docket Entry # 196, p. 13) (quoting '768 Patent at 2:54-57). This passage from the "specification . . . describes a *benefit* of the claimed invention," plaintiff contends, and the "[t]he claims themselves recite detailed steps and elements of the inventions." (Docket Entry # 196, p. 13). More specifically, plaintiff argues, that "the [']768 Patent claims are directed to detailed and innovative methods, systems, and programs improving on existing law enforcement communication technology including through,

17

*inter alia*, identifying and contacting a predetermined number of patrol units that are most geographically proximate, including through the use of wireless telecommunications networks." (Docket Entry # 196, p. 15).  As examples of these "detailed" elements, plaintiff points to claims 1, 3, and 37 of the '768 Patent.[8]  See (Docket Entry # 196, pp. 13-14).  Nowhere, however, does plaintiff actually identify or explain the purportedly "detailed and innovative methods, systems, and programs" in claims 1, 3, or 37.  See (Docket Entry # 196, pp. 13-14). Finally, plaintiff argues that: (1) the fact that claim 1 uses "a general purpose computer to perform an inventive method" does not make it abstract; and (2) "the Asserted Claims do not recite a desired result" but rather "specific steps that, when practiced, achieve a desired result."  (Docket Entry # 196, p. 15).

Both plaintiff and defendants analogize the '768 Patent's Asserted Claims to purportedly similar claims in other cases. This court will begin its review of those cases where, according to defendants, "[s]imilar claims have been held to be directed to abstract ideas."  See (Docket Entry # 192, pp. 13-14) (citing

---

[8]  For brevity, this court refers to the above Factual Background section rather than again reproduce the text of these Asserted Claims.

Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1351 (Fed.
Cir. 2016); In re Gale, 856 F. App'x 887, 888 (Fed. Cir. 2021)).

First, in Electric Power Group, LLC v. Alston S.A., the
Federal Circuit affirmed the ineligibility of patents that
"describe[d] and claim[ed] systems and methods for performing
real-time performance monitoring of an electric power grid by
collecting data from multiple data sources, analyzing the data,
and displaying the results."  Elec. Power, 830 F.3d at 1351.
Because "[t]he advance" the claims "purport[ed] to make [was] a
process of gathering and analyzing information of a specified
content, then displaying the results, and not any particular
assertedly inventive technology for performing those functions,"
the court concluded they were "directed to an abstract idea."
Id. at 1354.  Here, defendants allege that those claims are
"like the claims of the '768 [P]atent."  (Docket entry # 192, p.
14).  Plaintiff disagrees, reiterating that "the [']768 Patent
claims are directed to detailed and innovative methods, systems,
and programs improving on existing law enforcement communication
technology that, *inter alia*, identify and contact a
predetermined number of patrol units that are most
geographically proximate, including through the use of wireless
telecommunications network."  (Docket Entry # 196, p. 17).

In In re Gale, an appeal from the Patent Trial and Appeal
Board (the "PTAB"), the Federal Circuit affirmed the PTAB's

denial of a patent application concerning computer software.  In re Gale, 856 F. App'x at 888.  "[T]he challenged claims 'describe[d] a method in which a computer system: (1) receives critical test result messages with associated timing-related metadata, (2) reads the timing-related metadata, (3) calculates a usage pattern from the metadata, and (4) determines whether the calculated usage pattern is compliant by comparing it to a predetermined usage pattern requirement.'"  (Docket Entry # 192, p. 14) (quoting In re Gale, 856 F. App'x at 888).  The court concluded that the claims were "directed to the abstract idea of (1) collecting information ([] receiving messages and reading [] metadata), (2) analyzing the information ([] calculating a usage pattern and determining its compliance with a predetermined usage pattern), and (3) reporting the results."  In re Gale, 856 F. App'x at 889.  The court went on to note previous instances where it had "held that similar claims are directed to abstract ideas":

> See e.g. SAP Am., Inc. v. InvestPic, LLC, 898 F.3d 1161, 1167 (Fed. Cir. 2018) ("[S]electing certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis" is abstract.); Intellectual Ventures I LLC v. Cap. One Fin. Corp., 850 F.3d 1332, 1341 (Fed. Cir. 2017) ("[O]rganizing, displaying, and manipulating data of particular documents" is abstract.); FairWarning IP, LLC v. Iatric Sys., Inc., 839 F.3d 1089, 1093 (Fed. Cir. 2016) ("[T]he realm of abstract ideas" includes "collecting information," "analyzing information," and "presenting the results."); Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("[The]

process of gathering and analyzing information of a
specified content, then displaying the results" is
abstract.).

Id. Compared to these claims, defendants argue, "claim 1 of the
'768 [P]atent [] is much less detailed" and must therefore "be
directed to an abstract idea as well." (Docket # 192, p. 14)
(emphasis omitted). Plaintiff responds, however, that because
"In re Gale was an appeal of a PTAB order denying a patent
application, [] there was no presumption of validity over an
issued patent as there is here." (Docket Entry # 196, p. 17).
Additionally, plaintiff reiterates that the '768 "Patent is
directed to far more than collecting, analyzing, and reporting
information; the claims recite detailed and innovative methods,
systems, and programs improving on existing law enforcement
communication technology itself." (Docket Entry # 196, p. 18).

This court now turns to those cases where, according to
plaintiff, "analogous inventions" were found "to be patentable
under [s]ection 101." See (Docket Entry # 196, pp. 10-11)
(citing Sophos Inc. v. Rpost Holdings, Inc., No. CV 13-12856-
DJC, 2016 WL 3149649 (D. Mass. June 3, 2016); Perdiemco, LLC v.
Industrack LLC, No. 2:15-CV-1216-JRG-RSP, 2016 WL 5719697 (E.D.
Tex. Sept. 21, 2016), report and recommendation adopted, No.
2:15-CV-727-JRG, 2016 WL 5475707 (E.D. Tex. Sept. 29, 2016)).

First, in Sophos Inc. v. Rpost Holdings, Inc., the
defendant argued that the plaintiff's patents claimed

"unpatentable abstract ideas" because they claimed: "the electronic equivalent of certified mail, . . . the concept of notifying the sender that a message was successfully delivered, . . . the concept of notification when the certified message was not successfully delivered and . . . the concept of using a communication system or language when delivering certified mail." Sophos, 2016 WL 3149649, at *12. The defendant contended that the patents did "'not teach an algorithm or other novel technique for certifying the delivery of email,' but 'simply computeriz[ed] concepts that the post office has been using for years.'" Id. (citation omitted). The court disagreed, finding that the patents' "methods do more than provide proof of mailing" in that "they also provide proof of delivery and content," which are "task[s] that the United States Postal Service cannot do." Id. The court rejected the defendant's challenge to the patents' invalidity. Id. at *1, 13.

Next, in Perdiemco, LLC v. Industrack LLC, the defendants argued that the patents' "asserted claims . . . embod[ied] an abstract idea—'managing the dissemination of location and/or event information within a community.'" Perdiemco, 2016 WL 5719697 at *4. The defendants argued that one of the claims recited "'generic computing or location tracking technology'" and that, without such "conventional computer components," each

remaining step of the claim "'could easily be performed by humans without the need for any computer or location tracking technology.'"  Id. at 4-5 (citation omitted).  The court found their argument flawed, explaining that while "'mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention,' . . . this is not a license to delete all computer-related limitations from a claim and thereby declare it abstract."  Id. at 5.  Indeed, "in some circumstances the computer-related limitations of the claim will dispositively render the claim patent-eligible."  Id. (citing DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1257 (Fed. Cir. 2014) ("[T]he claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.")).  The court also noted that "the mere fact that all the recited computer components are 'conventional' because the applicant did not invent an entirely new kind of computer is not inherently troubling."  Perdiemco, 2016 WL 5719697 at *5 (citing Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1338 (Fed. Cir. 2016) ("[W]e are not persuaded that the invention's ability to run on a general-purpose computer dooms the claims."); KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 418-19 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since

uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.")).

This court, however, finds that claim 1 of the '768 Patent is most analogous to those claims (in cases such as Electric Power and In re Gale) that are abstract.  Claim 1 describes "a method performed by an information handling system" in the realm of law enforcement that consists of identifying and transmitting data, which claim 3 specifies occurs over "a wireless telecommunications network."  ('768 Patent at 9:61-10:9, 10:13-15).  "It is clear from the language of claim 1 that the claim _involves_ [the] abstract idea" of "communication over a network." See ChargePoint, 920 F.3d at 766-67.  Claim 1 also involves the abstract processes of "gathering and analyzing information of a specified content, [and] then displaying the results."  See Elec. Power, 830 F.3d at 1354; see also, In re Gale, 856 F. App'x at 889 (concluding claims were "directed to the abstract idea of (1) collecting information ([] receiving messages and reading [] metadata), (2) analyzing the information ([] calculating a usage pattern and determining its compliance with a predetermined usage pattern), and (3) reporting the results"); SAP Am., Inc. v. InvestPic, LLC, 898 F.3d 1161, 1167 (Fed. Cir. 2018) ("[S]electing certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis . . . is all abstract."); Intellectual Ventures

I LLC v. Cap. One Fin. Corp., 850 F.3d 1332, 1341 (Fed. Cir.
2017) (holding that "organizing, displaying, and manipulating
data of particular documents" are "abstract ideas");
FairWarning, 839 F.3d at 1093 (explaining that "the realm of
abstract ideas" includes "collecting information," "analyzing
information," and "presenting the results" (internal quotation
marks and citations omitted)); Content Extraction & Transmission
LLC v. Wells Fargo Bank, Nat. Ass'n, 776 F.3d 1343, 1347 (Fed.
Cir. 2014) (concluding that asserted patents were "drawn to the
abstract idea of 1) collecting data, 2) recognizing certain data
within the collected data set, and 3) storing that recognized
data in a memory").  Additionally, claim 1 does not use "any
particular assertedly inventive technology for performing those
functions."  See Elec. Power, 830 F.3d at 1354; ('768 Patent at
2:67–3:23).

Claim 1 of the '768 Patent is also similar to the claims in
OIP Technologies, Inc. v. Amazon.com, Inc., which the Federal
Circuit held were directed to "the abstract idea of offer-based
optimization."  OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d
1359, 1364 (Fed. Cir. 2015).  The offer-based price optimization
was achieved by "'sending a first set of electronic messages
over a network to devices,' the devices being 'programmed to
communicate,' storing test results in a 'machine-readable
medium,' and 'using a computerized system . . . to automatically

determine' an estimated outcome and setting a price.'" <u>Id.</u> at 1363.  "In other words, the claims simply required the performance of the abstract idea of offer-based price optimization on generic computer components using conventional computer activities." <u>Bascom</u>, 827 F.3d at 1351 (citing <u>OIP Techs.</u>, 788 F.3d at 1363).  The court also found that the claims were "exceptionally broad" and that "the computer implementation limitations [did] little to limit their scope." <u>OIP Techs.</u>, 788 F.3d at 1363.

At step one of the section 101 inquiry, however, "'it is not enough to merely identify a patent-ineligible concept underlying [a] claim; [this court] must determine whether that patent-ineligible concept is what the claim is directed to." <u>ChargePoint</u>, 920 F.3d at 766–67 (quoting <u>Thales Visionix Inc. v. United States</u>, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (internal quotation marks omitted)).  This court therefore continues its "analysis to determine whether the focus of claim 1, as a whole, is the abstract idea." <u>See ChargePoint</u>, 920 F.3d at 766–67.

To "understand 'the problem facing the inventor[s]' and, ultimately, what the ['768 [P]atent describes as the invention," this court reviewed the '768 Patent's specification. <u>See id.</u>  The specification indicates that the invention is, stated generally, "a method, system and computer program product for law enforcement." ('768 Patent at 1:15-17) (emphasis

26

added).  The specification goes on to describe the transmittal

of certain data with respect to such invention: "from a first

patrol unit, first data are received for identifying a location

of the first patrol unit," and "second data are received for

identifying a subject . . . vehicle" and/or "subject person."

('768 Patent at 1:21-25).  "A database is queried about the

subject and . . . a determination is made about whether the

subject is a likely threat."  ('768 Patent at 1:25-27).  Once a

subject is determined to be a likely threat, and based on the

location data transmitted from the first patrol unit, "a

predetermined number of second patrol units are identified that

are most geographically proximate to . . . the first patrol

unit, and a message is output to the . . . second patrol unit

about: the subject; the likely threat; and the first patrol

unit."  ('768 Patent at 1:27-33).  The specification contains

further detailed descriptions of the various components of the

"method, system and computer program product for law

enforcement."  ('768 Patent at 1:15-17).  The specification does

not, however, suggest that the underlying method, system, and

computer program product "is improved from a technical

perspective" as compared to other methods, systems, and computer

program products for law enforcement.  See ChargePoint, 920 F.3d

at 768 ("Notably, [] the specification never suggests that the

[network-controlled, electric vehicle] charging station itself

is improved from a technical perspective, or that it would operate differently than it otherwise could."). "Nor does the specification suggest that the invention involved overcoming some sort of technical difficulty . . . ." See id.

The following paragraph from the specification highlights the "problem facing the inventor[s]":

> The CSP [crime-fighting services platform] is helpful for accurately and efficiently aggregating, managing and communicating various information from and to the agencies and patrol units in support of their law enforcement activities, especially in view of: (a) the potentially large number of such agencies and patrol units; (b) their even larger number of various activities, and potential difficulty in timely obtaining and sharing relevant information about such activities, which are potentially complex; (c) a wide range of different circumstances and preferences of such agencies and patrol units; and (d) potentially frequent changes in such agencies, patrol units, activities, circumstances and preferences.

('768 Patent at 2:54-65). The specification does not otherwise suggest what "need" or "problem" the underlying invention sought to address. Compare ChargePoint, 920 F.3d at 767-78.[9] Based on

---

[9]   In ChargePoint, which concerned patents relating to electric vehicle charging stations, "the specification state[d] that '[t]here is a need for a communication network which facilitates finding [a] recharging facility, controlling the facility, and paying for the electricity consumed'" and "that '[t]here is a need for an efficient communication network for managing peak load leveling . . . .'" ChargePoint, 920 F.3d at 763, 767-78 (citation omitted). The specification also anticipated that "'there [would] be a need for a system for collection of taxes and consumption information.'" Id. at 778 (citation omitted). The court concluded "[f]rom these statements" that "the problem perceived by the patentee was a lack of a communication network

the specification, this court infers that the "problem facing
the inventor" was the lack of an apparatus or system that could
effectively and adaptively facilitate the collection and
communication of information between numerous, expansive, and
ever-changing law enforcement agencies and patrol units.  See
('768 Patent at 2:54-65); ChargePoint, 920 F.3d at 767-68.

   "[L]ooking at the problem identified in the ['768]
[P]atent, as well as the way the ['768] [P]atent describes the
invention, the specification suggests that the invention . . .
is nothing more than the abstract idea[s] of communication over
a network," ChargePoint, 920 F.3d at 768, and the aggregation,
manipulation, and analysis of data, see Intellectual Ventures,
850 F.3d at 1341 (Fed. Cir. 2017); FairWarning, 839 F.3d at
1093; Elec. Power, 830 F.3d at 1354.  As noted above, the
language of claim 1 itself also indicates that the claim is
"directed to the abstract" tasks of "'aggregating, managing, and
communicating various information . . . in support of law
enforcement activities.'"  (Docket Entry # 192, p. 6) (quoting
'768 Patent at 2:54-57); see, e.g., ChargePoint, 920 F.3d at
766-67; Elec. Power, 830 F.3d at 1354; SAP Am., 898 F.3d at
1167; Intellectual Ventures, 850 F.3d at 1341; FairWarning, 839

---

for [] charging stations, which limited the ability to
efficiently operate them from a business perspective."  Id.

F.3d at 1093; Content Extraction, 776 F.3d at 1347.  Claim 1 of
the '768 Patent describes data and communication related
processes that have previously been held abstract, is broadly
written, and "simply require[s] the performance of [] abstract
idea[s] . . . on generic computer components using conventional
computer activities."  See Bascom, 827 F.3d at 1351 (citing OIP
Techs., 788 F.3d at 1363).

>    B.   The Asserted Claims of the '965 Patent
>         Are Not Directed to an Abstract Idea

The Asserted Claims of the '965 Patent describe "[a]
method" consisting of: "receiving a prompt" from an individual
using "an application" on a "a mobile device" or "mobile
telephone, tablet or laptop computer" ('965 Patent at 15:10-11,
16:16-22); determining the location, which is an address or GPS
location, of such device ('965 Patent at 15:12-17); "identifying
one or more second mobile units within a geographic area
associated with the location" of the device ('965 Patent at
15:18-20); "outputting a communication to . . . mobile units"
('965 patent at 15:21-22); "enabling a direct communication link
between the" individual and "an operator associated with" the
mobile units by "opening a chat room" ('965 Patent at 15:23-25,
16:12-15); "receiving information specifying a location of
interest from the user operator with the prompt . . . with
respect to a visual layout" ('965 Patent at 15:26-34); and

"providing environment information to the . . . mobile units based at least in part on the prompt," such as "a visual representation" and "layout" of the location ('965 Patent at 15:36-41).

Defendants argue that, like the '768 Patent, the Asserted Claims of the '965 Patent are "directed to the abstract idea of 'aggregating, managing, and communicating various information . . . in support of law enforcement activities . . . .'" (Docket Entry # 192, p. 18) (quoting '768 Patent at 3:26-57).  The specifications of the Asserted Patents, defendants note, "share the same disclosure . . . regarding Figures 1 and 2, including the generic network 102 and computer system 200 environments." (Docket Entry # 192, p. 18).

Defendants also allege that, although the '965 Patent differs in that it "recites '*a direct communication link* between the user operator and an operator associate with a respective one of the one or more second mobile units,'" this link "is implemented with well-known and generic technology."  (Docket Entry # 192, p. 18) (quoting '965 Patent at 15:23-25).  By way of example, defendants cite to the specification's reference to Figure 10.  (Docket Entry # 192, pp. 18-19) (quoting '965 Patent at 8:46-48).  The specification describes Figure 10 "as a flowchart of an example process 1000 for enabling a direct communication link between operators of two devices."  ('965

Patent at 8:46-48).  The fifth step of the flowchart consists of

"[e]nabling a direct communication link between the user

operator and an operator associated with a respective one of one

or more second mobile units."  ('965 Patent at Figure 10).

Defendants contend that "Figure 10 merely repeats the intended

result of 'enabling a communication link' without further

elaboration'" and that "the specification only describes generic

'instructions that are executed by one or more processors' as

necessary for enabling such 'direct communication.'"  (Docket

Entry # 192, p. 19) (quoting '965 Patent at 8:48-55).

        Finally, defendants highlight the following section from

the specification:

> A location associated with the first unit is determined
> (1110). For example, an address and/or GPS location can
> be automatically determined for the first unit. The
> determination can be made, for example, by looking up an
> address associated with the first unit, by obtaining
> real-time GPS coordinates (e.g., if the first unit is
> mobile), by entry of a location by a user.

According to defendants, this description indicates that

"[c]laiming an optional 'GPS coordinates of the first unit' for

determining the first unit's location is [] generically

claimed[,]" as "[o]nly the ordinary and expected result of using

generic GPS is disclosed."  (Docket Entry # 192, p. 20) (quoting

'965 Patent at 12:18-24).  For these reasons, defendants argue

that the Asserted Claims of the '965 Patent are directed to the

abstract idea of "collection of data and its automated analysis."  (Docket Entry # 192, p. 20).

As with its defense of the '768 Patent, plaintiff argues that defendants mischaracterize and overgeneralize the Asserted Claims of the '965 Patent.  (Docket Entry # 196, p. 18). Plaintiff reiterates that the Asserted Claims in the '965 Patent "are not directed to mere aggregating, managing, and communicating information" and also denies that they are directed to "mere 'collection of data and its automated analysis'" or "'GPS data collection.'"  (Docket Entry # 196, p. 18) (citation omitted).  Instead, plaintiff argues, the '965 Patent "offers a specific technological solution to a technological problem."  (Docket Entry # 196, pp. 18, 20).  As an "example," plaintiff cites the entirety of claim 1 and also dependent claim 15.[10]  According to plaintiff, "[t]he Asserted Claims are directed to a detailed and innovative method including the steps of using GPS coordinates, identifying and communicating with mobile units, enabling a direct communication link between the user operator and an operator associated with one or more mobile units, such as through the use of a chat room, specifying a location of interest with respect to a visual layout of a facility, and providing environment information to

---

[10]  This court refers to the reproduction of such claims provided in the Factual Background.

the mobile units, including a visual representation of the location of interest." (Docket Entry # 196, p. 18).

Plaintiff also alleges that "[c]onventional law enforcement computer systems[] involved the use of intermediaries to facilitate communications during an emergency" and that "[t]he '965 Patent[s] solve[d] the inherent problems" of such an intermediary system by "'enabling *a direct communication link* . . . .'" (Docket Entry # 196, p. 19) ('965 Patent at 15:23). As a preliminary matter, this court notes that the patent specification does not itself indicate that such a problem existed and that the invention sought to remedy it. See ChargePoint, 920 F.3d at 768 ("Notably, [] the specification never suggests that the [network-controlled, electric vehicle] charging station itself is improved from a technical perspective, or that it would operate differently than it otherwise could."); see also Aatrix Software, 882 F.3d at 1128 (explaining that, to determine a patent's eligibility, a court may look to allegations in "sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice"). However, as noted previously, the complaint indicates that "[w]hen introduced, [] COPsync911 [] provided law enforcement the first and only in-car real-time information sharing and data communication network with threat alert service for schools and other potentially at-

risk facilities." (Docket Entry # 38 p. 9, ¶ 17). Viewing the complaint's facts in the light most favorable to plaintiff, this echoes plaintiff's contention that the '965 Patent "'offers a specific technological solution to a technological problem.'" (Docket Entry # 196, pp. 18, 20); see also In re TLI Commc'ns, 823 F.3d at 612 (indicating that claims can be "directed to a solution to a 'technological problem'" (citation omitted)). Regardless, this court's determination that the Asserted Claims in the '965 Patent are not directed to an abstract idea is based on the following reasons.

This court disagrees with defendants that the Asserted Claims of the '965 Patent are "directed to the abstract idea of 'aggregating, managing, and communicating various information . . . in support of law enforcement activities . . . .'" (Docket Entry # 196, p. 18) (quoting '965 Patent at 3:26-57). First, the fact that the Asserted Claims use purportedly generic GPS technology "is not inherently troubling." See Perdiemco, 2016 WL 5719697 at *5; see also Enfish, 822 F.3d at 1338 ("[W]e are not persuaded that the invention's ability to run on a general-purpose computer dooms the claims."); KSR Int'l, 550 U.S. at 418-19 ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.")). Additionally, "in determining whether the

[Asserted] [C]laims are directed to an abstract idea, [this court] must be careful to avoid oversimplifying the claims . . . ."  See In re TLI Commc'ns, 823 F.3d at 611.  The Asserted Claims of the '965 Patent involve "much more than mere 'GPS data collection.'"  (Docket Entry # 196, p. 20).

Second, although claim 1 of the '965 Patent involves "the abstract idea of 'aggregating, managing, and communicating various information . . . in support of law enforcement activities," (Docket Entry # 196, p. 18) (quoting '965 Patent at 3:26-57), this court reiterates that "'it is not enough to merely identify a patent-ineligible concept underlying [a] claim.'"  See ChargePoint, 920 F.3d at 766-67 (quoting Thales, 850 F.3d at 1349 (internal quotation marks omitted)).  Rather, this court "must determine whether that patent-ineligible concept is what the claim is directed to."  ChargePoint, 920 F.3d at 766-67 (quoting Thales, 850 F.3d at 1349 (internal quotation marks omitted)).  Looking at the specification and the language of the Asserted Claims in the '965 Patent, this court finds that the "focus" of the '965 Patent's Asserted Claims, "as a whole," is not the aggregation, management, and communication of various information in the realm of law enforcement.  See ChargePoint, 920 F.3d at 766-67.  Moreover, the "functions of the" method described in claim 1 are not "described in vague terms without any meaningful limitations," as is the case in the

'768 Patent.  <u>See</u> <u>In re TLI Commc'ns</u>, 823 F.3d at 612.  Rather,

the Asserted Claims of the '965 Patent are more appropriately

characterized as "'directed to an improvement to computer

functionality . . . .'" and communication systems in order to

better facilitate law enforcement activities.  <u>See</u> <u>id</u>.

II.  Step Two of the Section 101 Inquiry:
     <u>Whether the Asserted Claims Lack an Inventive Concept</u>

Defendants argue that the Asserted Claims also fail the

second step of the eligibility inquiry because they "lack an

inventive concept."  (Docket Entry # 192, p. 15).  The lack of

an inventive concept, defendants allege, is evidenced by how

claim 1 in each of the Asserted Patents does not require

"anything other than 'off-the-shelf, conventional computer,

network, and display technology' for practicing the abstract

idea."  (Docket Entry # 192, p. 15).  Defendants also argue that

"the '768 [P]atent never explains how the claims identify

'geographically proximate' patrol units" and that, with respect

to the '965 Patent, "reciting generic 'GPS coordinates of a

first unit' cannot supply an inventive concept to save the

claim."  (Docket Entry # 192, pp. 15, 22) (citations omitted).

Plaintiff, in turn, argues that "[t]aken as an ordered

combination, the Asserted Claims contain inventive concepts

sufficient to render them patent-eligible."  (Docket Entry #

196, p. 16).  According to plaintiff, "the inventions in the

[Asserted] Patents revolutionized existing technology for communicating with law enforcement, which largely depending on the use of intermediaries, had potentially deadly limitations on contacting the most geographically proximate emergency services, and were limited in the types and content of information that could be provided." As examples of the purportedly inventive concepts of the Asserted Claims, plaintiff notes that the Asserted Claims in the '768 Patent "recite, inter alia, 'receiving second data identifying a geographic area on an interactive map presented to an officer' and 'identifying a predetermined number of second patrol units that are most geographically proximate to the geographic area, and outputting a second message to the predetermined number of second patrol units about the first message.'" (Docket Entry # 196, p. 16) (citations omitted). As for the Asserted Claims in the '965 Patent, plaintiff highlights how they "recite, *inter alia*, 'enabling a direct communication link between the user operator and an operator associated with a respective one of the one or more second mobile units' and 'providing environment information to the one or more second mobile units based at least in part on the prompt wherein the environment information includes a visual representation of the layout of the facility at the location including a visual representation of the user specified location of interest.'" (Docket Entry # 196, pp. 16-17) (citations

omitted).  Finally, plaintiff draws support from the fact that the USPTO reviewed and ultimately approved plaintiff's patent applications, thereby indicating that the Asserted Patents satisfy section 101's eligibility requirements.  (Docket Entry # 196, p. 22).

Whether the Asserted Claims are "inventive" or instead "well-understood, routine and conventional to a skilled artisan in the relevant field" is a factual question.  See Berkheimer, 881 F.3d at 1368.  "[P]lausible and specific factual allegations that aspects of the [Asserted Claims] are inventive are sufficient" to defeat defendants' Rule 12(c) motion to dismiss.  See Cellspin, 927 F.3d at 1317.  This court may look for such allegations in "sources properly considered on a motion to dismiss, such as the complaint, the patent[s], and materials subject to judicial notice."  Aatrix Software, 882 F.3d at 1128.

"[N]ot every [section] 101 determination contains genuine disputes over the underlying facts material to the [] inquiry."  See Berkheimer, 881 F.3d at 1368.  For instance, the patent owner in Content Extraction & Transmission LLC v. Wells Fargo Bank, National Association argued that "certain dependent claims recite[d] additional steps" rendered those claims inventive but later "conceded" that certain technology described therein "was a routine function of scanning technology at the time the claims were filed."  Content Extraction, 776 F.3d at 1349. Similarly,

in Intellectual Ventures I LLC v. Capital One Bank (USA), a
patent owner argued that an "interactive interface" was "a
specific application of the abstract idea that provides an
inventive concept" and did not dispute that the interface was
generic.  Intellectual Ventures, 792 F.3d at 1370.
Additionally, "an inventive concept can be found in the non-
conventional and non-generic arrangement of known, conventional
pieces."  Bascom, 827 F.3d at 1350.

   This court agrees that "the limitations of the claims,
taken individually, recite generic computer, network and
Internet components, none of which is inventive by itself."
See Bascom, 827 F.3d at 1349; see also (Docket Entry # 192, p.
15).  But plaintiff "does not assert that it invented" such
components and the specification does not "describe those
elements as inventive."  See Bascom, 827 F.3d at 1349.  An
"ordered combination" of the Asserted Claims, however, may
present an inventive concept.  See id.  Here, whether the
elements (or combination thereof) of the Asserted Claims "were
well-understood, routine, and conventional to a skilled artisan
at the time of the patent [i.e., were inventive] is a factual
determination" in dispute by the parties that "goes beyond what
was simply known in the prior art."  See Berkheimer, 881 F.3d at
1368.  The complaint alleges that, "[w]hen introduced, []
COPsync911" (the underlying technology of the Asserted Patents)

"provided law enforcement the first and only in-car real-time
information sharing and data communication network with threat
alert service for schools and other potentially at-risk
facilities."  (Docket Entry # 38 p. 9, ¶ 17).  Additionally, as
previously noted, the Asserted Patents' specifications indicate
that the inventors sought to address the lack of an apparatus or
system that could effectively and adaptively facilitate the
collection and communication of information between numerous,
expansive, and ever-changing law enforcement agencies and patrol
units.  ('768 Patent at 2:54-65) ('965 Patent at 3:45-56).  The
'965 Patent also involves the potentially inventive concept of
"a direct communication link" between two users.  ('965 Patent
at 15:23-25, 16:12-15); see In re TLI Commc'ns, 823 F.3d at 612.
This court finds that, for the purposes of defendants' Rule
12(c) motion, the complaint and patents contain sufficiently
"plausible and specific factual allegations that aspects of the
[Asserted Claims] are inventive" such that dismissal of
plaintiff's patent infringement claims is inappropriate at this
stage.  See Cellspin, 927 F.3d at 1317; Berkheimer, 881 F.3d at
1370.

III. Claim 1 in Each of the Asserted Patents Is
     Representative of the Remaining Asserted Claims

     Defendants argue that all of the Asserted Claims are
invalid but only discuss claim 1 in each of the Asserted Patents

on the basis that claim 1 is representative of the remaining
Asserted Claims.  See (Docket Entry # 192, pp. 16-17, 22-23).
Plaintiff disagrees.  See (Docket Entry # 196, p. 12).

With respect to the '768 Patent, defendants argue that
"[t]he other asserted independent claims 19 and 37 merely recite
additional limitations concerning the application of understood,
routine, and conventional activity."  (Docket Entry # 192, p.
16).  "The dependent claims of the '768 [P]atent fare no better
in avoiding abstractness," defendants argue, because
"[d]ependent claims 2, 20, and 38 recite that the 'second data'
as being 'specified by a human officer,' and dependent claims 3,
21, and 39 recite that the data transfers as occurring via a
conventional 'wireless telecommunications network.'"  (Docket
Entry # 192, p. 16) (quoting claims 2, 3, 20, 21, 38, and 39 in
each of the Asserted Patents).  According to defendants,
"[t]hese dependent Asserted Claims remain focused on the
abstract idea of 'aggregating, managing, and communicating
various information . . . in support of law enforcement
activities,'" and therefore a section 101 analysis is
unnecessary.  (Docket Entry # 192, pp. 16-17) (citing Personal
Beasties Grp. LLC v. Nike, Inc., 341 F. Supp. 3d 382, 386
(S.D.N.Y. 2018) ("Addressing each asserted claim in a [section]
101 analysis is unnecessary when the claims are 'substantially

similar and linked to the same abstract idea.'" (quoting <u>Content Extraction</u>, 776 F.3d at 1348))).

Similarly, with respect to the '965 Patent, defendants argue that "[c]laim 1 is representative of the remaining Asserted Claims" (dependent claims 8, 11, 12, and 15-18) because they "merely recite additional limitations confirming their application of understood, routine, and conventional technology." (Docket Entry # 192, p. 22). More specifically, defendants allege that: "dependent claim 8 limits the 'environment information' to 'a layout of the facility,' which merely narrows the data at issue without providing an inventive concept"; "[c]laims 11 and 12 further evince the abstract nature of the claimed 'determining the location of a first unit' step by limiting it to 'accessing a record that includes information representing the location' and 'receiving information specifying the location along with the prompt,' respectively"; "[c]laim 15 limits the 'direct communication link' to a generic 'chat room'"; "[c]laims 16 and 17 limit the 'first unit' to a generic 'mobile device' and 'mobile telephone, tablet or laptop computer,' respectively"; and "claim 18 only adds an intended result step: 'providing an application on a mobile device for enabling the user operator to initiate the prompt.'" As such, defendants maintain that these dependent Asserted Claims are also focused on the "abstract idea of 'aggregating, managing,

43

and communicating various information . . . in support of law enforcement activities.'"  (Docket Entry # 192, pp. 22-23).

Plaintiff argues that "this alleged 'abstract idea' is actually a benefit of the claimed inventions, not the subject matter to which the claims are 'directed.'"  (Docket Entry # 196, p. 12).  Additionally, plaintiff alleges, "[t]he other asserted claims recite additional concrete and tangible elements—not recited in the claims selected by [d]efendants—that must be considered in a [s]ection 101 analysis."  (Docket Entry # 196, p. 12).  By way of example, plaintiff cites to: claim 3 of the '768 Patent ("[t]he method of claim 1, wherein receiving the first data, receiving the second data, and outputting the second message occur via a wireless telecommunications network"); claim 8 of the '965 Patent ("[t]he method of claim 1 wherein the environment information includes a layout of the facility"); and claim 15 of the '965 Patent ("[t]he method of [c]laim 1 wherein enabling a direct communication link includes opening a chat room for facilitating direct communication between the user operator and users associated with the one or more second mobile units").  (Docket Entry # 196, p. 12).

Defendants need not "engage in an extended attack on each of the" Asserted Claims to successfully argue that all are invalid.  See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n, No. 12-2501 MAS TJB, 2013 WL 3964909, at

*5 (D.N.J. July 31, 2013), aff'd, 776 F.3d 1343 (Fed. Cir. 2014). "Where the claims . . . are substantially similar and linked to the same abstract idea, [this] [c]ourt is free to dispose of the additional claims in a less detailed fashion." Id.; see also, e.g., Bilski v. Kappos, 561 U.S. 593, 611–12 (2010) (concluding all asserted patent claims were invalid after analyzing only two of the claims). With respect to the '768 Patent, independent claims 19 and 37 "recite substantially the same concept" as claim 1 "but do so in the context of an apparatus or system." See In re TLI Commc'ns, 823 F.3d at 610 (concluding that a method claim was representative of claims that "recite[d] substantially the same concept but . . . in the context of an apparatus or system"). Dependent claims 2 and 3 add certain features to claim 1, as do dependent claims 20 and 21 to claim 19 and dependent claims 38 and 39 to claim 37.[11] The modified or additional details of independent claims 19 and 37 and dependent claims 20, 21, 38, and 39 do not render them substantially different to claim 1. This court therefore finds that claim 1 is representative of the remaining Asserted Claims in the '768 Patent.

As for claim 1 in the '965 Patent, it too is representative of the remaining Asserted Claims in that patent. Claim 1 is the

---

[11]  Rather than again reproduce the text of the '768 Patent's Asserted Claims, this court refers to the Factual Background.

only independent Asserted Claim of the '965 Patent.  Although

dependent claims (claims 8, 11, 12, 15, 16, and 18) add certain

limitations to claim 1,[12] they are "substantially similar and

linked to the same idea" of claim 1.  See Content Extraction,

2013 WL 3964909, at *5.  This court therefore finds that claim 1

of the '965 Patent is representative of the remaining Asserted

Claims in that patent.  However, as detailed previously, this

court concludes that the Asserted Claims in the '965 are not

directed to an abstract idea.

                              CONCLUSION

     For the foregoing reasons, this court **RECOMMENDS**[13] that

defendants' Rule 12(c) motion to dismiss (Docket Entry # 191) be

**DENIED.**


                         /s/ Marianne B. Bowler
                         **MARIANNE B. BOWLER**
                         United States Magistrate Judge


---

[12]  This court refers to the Factual Background for a
reproduction of the '965 Patent's Asserted Claims.
[13]  Any objections to this Report and Recommendation must be
filed with the Clerk of Court within 14 days of receipt of the
Report and Recommendation to which objection is made, and the
basis for such objection should be included.  See Fed. R. Civ.
P. 72(b).  A party may respond to another party's objections
within 14 days after service of the objections.  Failure to file
objections within the specified time waives the right to appeal
the order.